J-A28014-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.B.S., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 812 MDA 2021 |

Appeal from the Decree Entered May 27, 2021
In the Court of Common Pleas of Mifflin County Orphans' Court at No(s):
2020-00011

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED: MARCH 11, 2022**

A.B. (Mother) appeals from the decree, entered in the Court of Common Pleas of Mifflin County, Orphans' Court Division, involuntarily terminating her parental rights to R.B.S., Jr. (Child) (born 12/10),[1] pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b) of the Adoption Act.[2]   After careful review, we affirm.[3]

---

[*] Former Justice specially assigned to the Superior Court.

[1] The court also terminated the parental right of R.B.S., Sr. (Father) to Child. Father's appeal is docketed at 858 MDA 2021.

[2] 23 Pa.C.S.A. §§ 2101-2938.

[3] Guardian *ad litem*, Erica J. Shoaf, Esquire, did not file a brief, stating she supported the brief filed by Appellee Mifflin County Children and Youth Services (Agency).  **See** Letter, 10/15/21.  Child was also represented at the hearing by Brian R. Baker, Esquire. **See In re: Adoption of L.B.M.**, 161 A.3d 172, 180 (Pa. 2017) ("[W]hen a child's relationship with his or her birth family
*(Footnote Continued Next Page)*

In November 2017, Mother was arrested with three of her four children in the car with her, and charged with driving with a suspended license, endangering the welfare of children, possession of drug paraphernalia, and driving under the influence of a controlled substance. At the time, the children were asleep in the car, without proper restraints. The family has a history with Mifflin County Children and Youth Services (Agency) pertaining to concerns of abuse, drug use, lack of supervision and other safety concerns. Three days after Mother was arrested, Father tested positive for cocaine.

On December 1, 2017, the court adjudicated Child and his three siblings dependent. *See* Dependency Order of Adjudication, 12/1/17. All the children were removed from Mother's care. Two years later, on December 17, 2019, the court suspended Child's visits with Mother. On May 15, 2020, Child's three siblings were returned to Mother's care. Child remained in foster care. The Agency petitioned for termination of Mother's parental rights on June 4, 2020.[4]

_____

could be severed permanently and against the wishes of the parents, the legislature made the policy judgment, as is evidenced from the plain, unambiguous language of the statute, that a lawyer who represents the child's legal interests, and who is directed by the child, is a necessity."). As our Court has explained, a child's legal interests are distinct from his best interests. *In re: Adoption of L.B.M.*, 161 A.3d at 174. Representing the child's "'[l]egal interests denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation," while a guardian *ad litem* discerns the child's best interests; in each case, these interests are ultimately determined by the orphans' court." *In re: Adoption of K.M.G.*, 240 A.3d at 1243 n.20 (quoting *In re: T.S.*, 192 A.3d at 1082 n.2 (quoting Pa.R.J.C.P. 1154, cmt.)); *see also In re: Adoption of L.B.M.*, 161 A.3d at 174 n.2.

[4] Child's visits with his siblings were suspended on July 14, 2020.

At the termination hearings on February 2, 2021, and March 10, 2021, the court heard testimony from Agency assistance director, Nicole Patkalitsy, Dr. Kristen Hennessy, Child's treating psychologist and expert in childhood trauma, David G. Ray, a licensed psychologist who performed Mother's psychological evaluation, Darlene Griffith, a family counselor at Family Intervention Crisis Services (FICS), who provided reunification services to both Mother and Father, and Ruth Ann Kanagy, the coordinator for Single Parent Family Ministry, who provided individual and group support services for Mother through Locust Grove Mennonite Church. Mother also testified at the hearing.

The Honorable Aaron L. Gingrich summarized the facts as follows:

[Child] has a diagnosis of Post-Traumatic Stress Disorder [PTSD]. [Child's] mental health has deteriorated throughout the duration of this case. The underlying facts of [Child's] PTSD are hard to discern. [Child] alleges that Father sexually abused him and his siblings, which has led to many of [Child's] mental health issues throughout this case. These allegations were [deemed] unfounded by the [Mifflin County Children and Youth Services] (Agency). However, through extensive testimony, [Child] has witnesse[d], and potentially been subject[ed] to, domestic violence at the hands of [] Father. Additionally, [Child] has special education services and an individualized education plan [(IEP)] through the school. [Child] has significant mental health concerns[,] which has caused him to move placements three times during the course of this case. [Child] struggles with suicidal ideation, violent outbursts, and goes to trauma therapy weekly.

[] Mother and Father had an incredibly tumultuous relationship. Mother testified that the relationship was abusive and co-dependent, and both Mother and Father struggled with drug use. Additionally, there were allegations of physical and sexual abuse by Father toward both Mother and the children. [ ] Father

- 3 -

vehemently denies the allegations that he ever sexually abused his children, and no criminal charges have ever been filed against Father for the alleged sexual abuse of [Child] or [Child's] three siblings. Agency[,] however, testified that not believing and supporting [Child's] allegations from the beginning, and consistently throughout, points to Mother's lack of protective capacity, one of Mother's goals. [Kristen] Hennessy[, Ph.D., licensed psychologist,] further testified that Mother not consistently believing [Child] has caused [Child] to be re-traumatized. [] Mother does believe that [Child] has been traumatized by the domestic violence in the home and the combined drug use [by] her and Father before Mother got sober.

The Agency took [] issue over Mother's alleged inconsistency and her alleged inability to tell the Agency the truth. The Agency also had extensive testimony about Mother's alleged inability to "buy in" to [Child's] trauma. The Agency had Dr. Hennessy testify to her time with [Child], as well as [to] conversations with Mother. Doctor Hennessy testified that [Child] does not feel safe due to Mother's behaviors. Doctor Hennessy testified that she believes Mother is not consistent in believing that [Child] was traumatized by both Mother and Father. Doctor Hennessy testified that [Child] has very specific triggers and very volatile responses to triggers. [Child] has on previous occasions attempted to harm himself and his foster parents.

Father's visits were suspended [on December 17, 2019] due to the allegations of sexual abuse, and due to Father being incarcerated. Doctor Hennessy recommended suspending Mother's visitation after receiving information from [Child's] placement at the time that[,] when he was told about visits, he would have sexual and violent reactions. The incident Dr. Hennessy specifically outlined was when [Child] was told about a visit he began smacking his butt, attempting to stab his butt [sweatpants on] with Chapstick, and then putting the Chapstick in his mouth. This incident was followed by pushing his foster parents, stating he wanted to die, attempting to choke himself, and hurting his feet on a wall. During this incident, [Child] did say he wanted his Mother. Doctor Hennessy testified that [Child] is extremely conflicted about his feelings toward his Mother and that he does want to see her, he wants a relationship with her, but he does not feel safe in her care. Doctor Hennessy ultimately asked for suspended visitation with Mother because [Child] was having these violent outbursts, and she wanted him to settle into the foster home, [and] learn how to manage his emotions before

attempting to visit with Mother. Doctor Hennessy then recommended suspending visitation with [Child's] siblings after the siblings were returned to Mother's home. In her letter recommending suspending visitation with the siblings, Dr. Hennessy noted that [Child] was doing better[,] but after the siblings had been returned to Mother's home, there [were] issues with the visits. Doctor Hennessy wrote that [Child] had reactions to how much the siblings spoke about Mother, and that he had been thinking about Mother more. He then asked to read the letter his Mother wrote him, which made him upset. The next day, [Child] was in in such a state of crisis, he was [placed] in an inpatient facility. [Child] has not had contact with any family member since this time. [] Doctor Hennessy also testified that since suspended visits, [Child] has expressed desire to be with Mother, see Mother, or return to her care, but that he also does not feel safe with Mother, and expresses more desire to be adopted by his foster family.[5]

Trial Court Opinion, 5/24/21, at 1-6.

Following the termination hearing, Judge Gingrich entered a decree on May 21, 2021, terminating Mother's parental rights to Child.[6] On appeal, Mother raises the following issues:

---

[5] Child's foster family is an adoptive resource. *See* N.T. Termination Hearing, 2/2/21, at 70.

[6] The relevant grounds for termination, as set forth 23 Pa.C.S.A. § 2511, are as follows:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

*(Footnote Continued Next Page)*

1. Whether the lower court erred in finding that the Agency had presented clear and convincing evidence that Mother has caused Child to be without essential parental care and the conditions cannot be remedied[,] when the court denied Mother the ability to demonstrate her ability to care for Child by refusing contact between Mother and Child for over a year?

2. Whether the lower court erred by improperly allowing Child's therapist to make the decisions on visitation and contact between Mother and Child, and ultimately on the termination of parental rights decision?

3. Whether the lower court erred in finding that the Agency presented clear and convincing evidence that Child's trauma, which was not connected to Mother until the Agency expressed displeasure with the lower court and which was not a factor

_____

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(2), (5) & (8).

that led to removal or placement, is a condition that requires termination of Mother's parent rights?

4. Whether the lower court erred in finding the Agency presented clear and convincing evidence that the conditions that led to the removal or placement continue to exist and termination of Mother's parental rights serves the needs and welfare of Child?

5. Whether the lower court erred in finding that the Agency presented clear and convincing evidence that the conditions and cause of the incapacity, abuse, neglect or parental refusal cannot or will not be remedied by Mother?

6. Whether the lower court erred in finding that the Agency presented clear and convincing evidence that the conditions that led to the removal or the placement of Child continue to exist, and that Mother is not likely to remedy the conditions within a reasonable period of time?

7. Whether the lower court erred in finding that the Agency presented clear and convincing evidence that terminating Mother's parental rights serves Child's best interests?

Appellant's Brief, at 5-7.

In cases involving termination of parental rights, "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *In re Z.P.*, 994 A.2d 1108, 1115 (Pa. Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009)). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (en banc) (internal citations omitted). On review, "we employ a broad, comprehensive

review of the record in order to determine whether the trial court's decision is supported by competent evidence." *Id.*

> Parental rights may be involuntarily terminated where any one subsection of [s]ection 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his . . . parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

Here, the court found the Agency established grounds for termination by clear and convincing evidence under sections 2511(a)(2), (5) and (8) of the Adoption Act.[7] The court also determined that termination of Mother's parental rights was in Child's best interest pursuant to section 2511(b).[8]

_____

[7] We can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc); *see also In re L.M.*, *supra*. Because we affirm with respect to subsection 2511(a)(8), we find it unnecessary to address the claims Mother raises in issues 5 and 6.

[8] Under section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

*(Footnote Continued Next Page)*

Mother argues termination of her parental rights to Child was improper and not supported in the record. She argues that she has made significant progress, prompting the trial court to find that the circumstances that led to removal with respect to Child's siblings had been alleviated. Mother contends the trial court is bound by that determination and finding of fact with respect to Child. Appellant's Brief, at 10. We disagree. Mother's argument disregards the overwhelming evidence of record that supports the court's finding that Child's issues differ significantly from those of his siblings, and that Child's needs and welfare are best met by terminating Mother's parental rights and freeing Child for adoption by his foster parents.

Judge Gingrich acknowledged Mother's "sustained and successful progress," and that Mother's progress enabled the court to return Child's siblings to her care; however, he emphasized that Child's case is "highly complicated." Trial Court Opinion, 5/24/21, at 11-12. Notably, the court stated: "While a majority of testimony was presented on Mother's misgivings, the [c]ourt feels that this case comes down to the PTSD and mental health

---

In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, [s]ection 2511(b) does not require a formal bonding evaluation.

*In re Z.P.*, *supra* at 1121 (internal citations omitted).

issues of [Child] rather than any lack of progress Mother has made while working towards reunification." *Id.* at 12.[9]

Nicole Patkalitsky, the Agency's Assistant Administrator, who supervised Child's caseworker, testified that the concerns that necessitated Child's placement were: lack of protective capacity to ensure Child's safety; inability to demonstrate proper parenting; mental health concerns; drug use and criminal activity; and domestic violence. N.T. Termination Hearing, 2/2/21, at 13. The first four permanency review hearings showed minimal progress on Mother's part. The fifth and sixth review hearings showed Mother had made moderate progress. *Id.* at 11-12. Patkalitsky testified that conditions that led to Child's placement continue to exist with respect to Mother, and it would not be safe for Child to be returned to Mother's care. *Id.* at 33. She also stated, several times, that although the conditions that led to removal were alleviated with respect to Child's siblings, *they continued to exist with respect to Child*. *See id.* at 39-40. Patkalitsky acknowledged that Mother had substantially complied with the Child Permanency Plan and was making every effort possible to meet her goals. *Id.* at 48, 57.

Doctor Kristen Hennessy, Child's treating psychologist and an expert in the field of childhood trauma, testified on behalf of the Agency. *Id.* at 100. Doctor Hennessy began weekly therapy session with Child in February 2019,

---

[9] Mother successfully completed counseling and parenting classes, is employed full time, has suitable housing at her mother's home, and has community support. N.T. Termination Hearing, 2/2/21, at 286.

noting the initial concern was Child "did not feel safe anywhere." *Id.* at 102. She diagnosed Child with PTSD, *id.* at 103, and testified that part of Child's treatment required "trauma-informed parenting,' which requires validation of his experiences as he reports them and the ability to help Child feel safe. *Id.* at 112. Doctor Hennessy testified as to her concerns with Mother:

> I do believe that [Mother's] responses have had a very significant impact on [Child's] healing because what [Child] reports is feeling as though [Mother] does not believe what has happened to him consistently and that she goes back and forth on that and that she does not want him to express or speak about the things have happened to him. [Child] says that when a child reports abuse, you should believe them right away, and that if you don't, then [Child] doesn't trust that person and that is something that [Child] feels very strongly about and becomes triggered by when he feels that someone is – and specifically his Mother[,] he has felt has not been willing to support him in that. . . . [Child's] description of why he does not feel safe is he reports that mom has changed her stance at times. He reports that mom has said things to him like ["]I am saying that I'm breaking up with your dad, but I'm really going to stay with him because I know you guys want your dad in your life,["] things like that. He reports that he feels that the family system is angry with him for what he has expressed. He also reports that [] there have been times when he was alleging physical abuse that he says mom and siblings were present for and when I spoke about that with Mother, Mother said ["] what about all the times I took a beating for him?["] So [Child] is reporting that he does not feel as though the family is okay with him expressing his truth and receiving support for his experiences. [Child's] triggers for trauma right now are reminders of his biological family, are things that remind him of plastic bats which is something he says he was beaten with, and questions of truth where he feels that he is not being believed.

*Id.* at 111-12, 18-19.

Doctor Hennessy stated that she requested Mother's visits be suspended because of Child's "severe negative reactions that were occurring before,

during, and after visits." *Id.* at 120. Child was "clinically unstable" and experiencing "exacerbation of symptoms before, during, and after the visits." *Id.* at 122. When visitation stopped, Child "did not have incidents of the dangerous self-harm or suicidal behavior or ideation[.]" *Id.* at 122. Child's sibling visits also exacerbated his symptoms. *Id.* at 136. Doctor Hennessy explained why she requested Mother's visits be suspended:

> I made the request to keep my patient and his foster family safe and to keep my patient out of the hospital, is my short answer. My longer answer is that [Child] was stable. He was doing well. I'm not saying that he had no symptoms or behaviors. I'm saying that they were not safety concerns where we were having to consider hospitalizations. Prior to his siblings returning [to Mother], [Child] had some difficult reactions to his visits with siblings, but they were manageable. So [Child] would say I have a sibling visit. Can I have a session with you after my sibling visit? He was able to work with me and with his foster family to stay stable despite the visits being a stressor. Because we want children to have sibling contact, if we are able to put support in and allow it to happen, we're going to do that. We tried mightily after his siblings went home. We tried mightily to make the sibling contact safe. . . . Despite that, it took tremendous efforts to keep that child outpatient. After he had the sibling visit, he started a period of decompensation where he was not only suicidal, he tried to stab his foster mother with a broken pencil, and he ripped out her hair. That was his response to visitation. It took tremendous therapeutic work of daily sessions. . . . I think it was least three days in a row of therapy to get him back out of that escalated state after the contact with siblings. So the reasons that I asked to stop [were] the same reasons that I asked to stop the visitation with Mother, to keep my patient safe and to keep my patient out of institutional settings.

*Id.* at 135-37. Doctor Hennessy, who at the time of the hearing had been treating Child for two years, stated Child has made "tremendous progress"

- 12 -

and "his future is bright if we can continue to keep him in environments where he feels safe." *Id.* at 1380. She explained:

> [Child] was having daily incidents of verbal and physical aggression. He was having frequent trauma, startled responses. He was struggling every day. Now we have a child who is – remember, we had a child who presented in therapy saying, ["]safety isn't a thing. I do not feel safe anywhere, and I don't even believe safety is possible.["] Now we have a child who reports that he feels safe in his foster home, that he feels safe at his school, and we're seeing a child who is thriving other than when he gets triggered. When he gets triggered, we see serious, significant and unsafe behavior. But when he is not triggered, this kid is doing extremely well and is flourishing.

*Id.* at 138-39. Doctor Hennessy stated that Child's triggers are "his biological family, items that remind him of things that remind him of abuse, . . . plastic bats or things that remind him of plastic bats." *Id.* at 139. Child is also triggered "when he feels that people do not believe him about his experiences of trauma. Those are the three things that predictably set this kid off." *Id.*[10]

David G. Ray, M.Ed., who performed a psychological evaluation of Mother, which included evaluation of parental capacity, diagnosed Mother with a personality disorder. N.T. Termination Hearing, 2/2/21, at 203, 206-07. In his opinion, Mother's disorder affected her thinking, her expression of

---

[10] Mother's claim in issue 2 that the court allowed Dr. Hennessy to "to make the decisions on visitation and contact between Mother and Child, and ultimately on the termination of parental rights decision" is not supported in the record. The court stated it would not "*sua sponte* lift suspended visitation where the minor child is presenting suicidal ideation over visiting with a parent." Pa.R.A.P. 1925(a) Opinion, 7/14/21, at 2. Further, the court noted Mother did not petition for review of that suspension after the Agency's emergency petition was granted. *Id.*

emotions, her interpersonal function and her impulse control, and he explained how this disorder negatively impacted her capacity to parent. *Id.* at 207-210.

> I formulated the opinion that the Mother lacked the capacity to parent, to make appropriate judgments, [] such that I felt she lacked the capacity to parent, particularly [Child], to give him an environment where he feels safe, where he could grow and[] process through his trauma that he has experienced, which [to] my understanding has been extensive, and that as a result of that I said that in my opinion she lacked [] parental capacity. . . . [Mother] has made positive changes for the betterment of herself, [however s]he does not show enough long-lasting positive changes to appropriately parent her children who have been traumatized due to poor choices she has made as their [m]other.

*Id.* at 214, 216. Ray also stated that he knew of no other services that could remedy Mother's incapacity to parent. *Id.* at 217.

Ray also observed Child with Mother, performed a bonding analysis, and ultimately recommended termination of Mother's parental rights. Ray testified that Child "does not have a healthy secure attachment to Mother, and that since visits were suspended[,] his suicidal ideation had stopped." *Id.* at 219. He stated that because Child lacked a healthy secure attachment to Mother, severing the bond would result in minimal issues. *Id.* at 218-20, 277. He also testified that permanency with the foster family would provide a healthy and safe environment and stressed that the benefits of permanency for Child outweigh any detriment that might result from severing the attachment he has to Mother. *Id.* at 220. As Ray indicated in his psychological evaluation, there is a stark contrast in Child's behavior with Mother and with his current

foster parents, whose home Child has been in since October 2019. "[Foster family has] provided a warm, loving, nurturing, structured atmosphere that has met [Child's] educational, psychological, emotional, and behavioral needs." Psychological Evaluation, 4/28/20, at 25.

With respect to separation from his siblings, Ray testified:

No one likes to see siblings separated, but this case has been very long and drawn out and [Child] has shown significant dysfunction from the very beginning. He just wasn't functioning well at all in the same home with his siblings. He blossomed when he separated from them – he started to blossom, or I should say he started to heal. From everything I have read in the record this is a very sick young man.

*Id.* at 220-21. Ray also opined that Child's needs were much different than his three siblings:

[B]efore the [j]udge returned the children home, the Agency[,] with much forethought and I would presume by [o]rder of the [j]udge[,] agreed, [and] came to the conclusion based on perhaps [Child's] therapist that it was better for [Child] to be separated from his siblings than maintained in the same foster home. And when I read about [Child's] behavior and then I saw [Child] in the foster home[] that he was in, that seemed to support that that recommendation was a good one. **So what I'm saying is [Child] is different than his siblings. His needs are greatly different. Given the extensive trauma and suicidal thoughts, [] his parenting needs are far greater than any of those three children**.

N.T. Termination Hearing, 2/2/21, at 272-73 (emphasis added).

Ray testified that he rendered his opinion as to Mother's parental incapacity within a reasonable degree of psychological certainty. *Id.* at 221. He concluded that his opinion was based on the fact that Mother exercised

- 15 -

poor judgment even while sober, that he did not anticipate her judgment to improve as the length of her sobriety increased, and that termination was, in his opinion, in Child's best interest.  *Id.* at 275-76.[11]  Ray also clarified that his evaluation and opinion was as of April 28, 2020.  *Id.* at 267.

Darlene Griffith, family counselor at FICS also testified.  FICS, referred by the Agency, began providing services to Mother in March 2018.  FICS offered Mother counseling, parent education, lifestyle checks, supervised visits, drug screens, transportation, and pill counts.  N.T. Termination Hearing, 3/10/21, at 296-98.  Griffith testified that FICS services stressed the importance of safety plans, consistency and routine, setting expectations and follow-through, as well as modeling how to calm Child when he was in a "heightened state."  *Id.* at 305.  Even after [Child] stated Father sexually and physically abused him and his belief that Mother knew about it, Mother maintained contact with Father until August 2019.  *Id.* at 300, 369.  In addition to her concerns about Mother's poor decision-making and lack of

_____

[11] In his psychological evaluation, Ray noted Mother's various arrests and incarcerations from 2008 through 2017, and he stated what he found "particularly concerning is that a number of these charges, . . . occurred during the periods of time when she was clean and sober."  Psychological Evaluation, 4/28/20, at 11.  Noting that this illustrated Mother's lack of judgment, Ray stated, "While the confinement in February of 2017 occurred during the period of time she was utilizing drugs, the one in 2014 did not. . . .  These instances of disregard for the rules of authority are examples of a decided lack of boundaries which suggest characterological impairment[,] which impacts one's parenting and protective capacity."  *Id.*  Significantly, Ray also stated: "**The contrast between [Mother's] progress and concerns is what has made this case so complex**."  *Id.* at 23 (emphasis added).

protective capacity, Griffith testified that Mother was dishonest with her with respect to her contact with Father and domestic abuse issues. *Id.*

Griffith did state that Mother has been successfully discharged from counseling, from Clear Concepts, and from Project Point of Light. She stated Mother has maintained employment since March 2019 and "overall[] she has made some significant progress." *Id.* at 317. However, she testified that "even though [Mother] has made progress in her personal life and has remained sober for over [] two years now, she has not made the therapeutic progress that she would need in order to keep [Child] safe." *Id.* at 319.

Griffith also testified that she observed Child with his foster family:

[Child] is [] doing very well. I have monthly contact with him. Any time I talk to him he seems very calm and happy. He refers to [foster parents] as mom and dad and the other child in the home as his brother, and he has stated that he feels safe there. . . . I do know that they are an adoptive resource for [Child].

*Id.* at 331-32.

Ruth Ann Kanagy, the coordinator for Single Parent Family Ministry, testified on behalf of Mother. Kanagy testified that her background included administration and leadership, school superintendent, and working in children's ministry. *Id.* at 383. She stated she meets with families and provides emotional and spiritual support, as well as financial help. *Id.* at 384. Kanagy testified that she met with Mother at least monthly, that Mother attends the Single Mom Support Group, and Child's siblings attend church at Locust Grove. *Id.* at 385-87. Kanagy stated that Mother was active in the

support groups, had the benefit of community support, and was always receptive to her suggestions and advice. *Id.* at 388-39.

Finally, the court heard testimony from Mother. Mother stated that she lived with her mother and Child's three siblings, and that "if there is a trigger that I could possibly be to [Child], I believe that that is to the old environment, to the old situation." *Id.* at 393-95. Mother testified that her life has changed significantly since 2017, when Child was removed from her care, but did state that she "was pulled over for driving without [a] license [] a month ago." *Id.* at 396.

Mother also testified to steps she has taken to address domestic violence–obtaining a PFA, obtaining services from the Mifflin County Abuse Network, putting the children into support groups at Locust Grove, changing the locks and putting alarms on the doors, creating a safety plan for the children, and having neighbor support in the event Father would come to the house. *Id.* at 398-403. She also testified that part of the plan precludes any communication with Father. Finally, Mother testified that in addition to her spiritual support and guidance, she changed her lifestyle, eliminated negative people from her life, completed counseling for substance abuse and sexual abuse, attended parenting classes, and obtained full-time employment. *Id.* at 404-05, 431.

With respect to Child's allegations of sexual abuse by Father, Mother stated:

I have believed for quite some time that that is true. I have had conversations with my children. The details that they told me as child[ren] of their age would [not] know those details if it was not true. In the beginning, yes, I did struggle with whether or not they were telling the truth because it was back and forth so much, and I didn't know what to believe. Even though I wasn't sure, when [Child] came to me and said those things, I knew it didn't matter what I was dealing with, what I was struggling with, I knew that I had to get them out of there. Kids don't just say those things. Whether I was struggling with it or not, I knew it was not a safe environment.

*Id.* at 407-08. Mother also testified that for the two years that she was allowed visits with Child, he "made it clear that he wants to come home[,]" and then after visits were suspended, "it seemed like now this last year of not being able to see me everything has changed." *Id.* at 418.

We agree with the trial court that this a complex case. It is also extremely troubling. Despite struggling at the start, Mother has made remarkable progress in her plan objectivies. She attended and successfully completed various counseling and parenting classes, explained how she applied what she had learned, obtained full-time employment and suitable housing, created safety plans, and sought out and continues to engage with a community that provides spiritual and emotional support. Nonetheless, at the time Mother's visits were suspended, Child had already been in placement for over twenty-four months. On June 4, 2020, when Mother had notice of Agency's petition for termination, Child had been in placement for 30 months. We cannot require the Agency "to extend services beyond what our legislature has deemed a reasonable time after state intervention or require Herculean efforts[.] . . . Nor, in the interests of the children, should we."" *In re J.T.*,

817 A.2d 505, 509 (Pa. Super. 2003). This Court has acknowledged the following:

> [T]he application of [subs]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of [his/]her children. [However b]y allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013), quoting *In re I.J.*, 972 A.2d 5, 11-12 (Pa. Super. 2009). Furthermore, termination under section 2511(a)(8) does not require of evaluation of Mother's willingness or ability to remedy the conditions that initially caused placement. *In re Z.P.*, *supra* at 1118.

Here, the Agency satisfied the threshold requirement of section 2511(a)(8), which mandates that Child be removed from Mother for at least twelve months. Next, the record reveals that the condition that led to Child's removal from Mother's care in December 2017, Mother's inability to provide her son a safe and secure environment, continued to exist, and that terminating Mother's parental rights would best serve Child's needs and welfare. 23 Pa.C.S.A. § 2511(a)(8).

The court found credible Dr. Hennessy's testimony, as well as that of Ray and caseworkers Patkalitsky and Griffith, that "Child's trauma and extensive triggers linked to Mother's care continue to exist[,]" and that despite

Mother's attempts to remedy the issues, "the trauma continues to exist" and Child "is still not safe in Mother's care[.]" Trial Court Opinion, **supra** at 17. The testimony of record supports the court's decision to terminate Mother's parental rights based on Mother's inability to consistently demonstrate the judgment and parental capacity necessary to ensure this particular Child's physical and emotional safety. **See In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010) (as ultimate trier of fact, trial court is empowered to make all determinations of credibility, resolve conflicts in evidence, and believe all, part, or none of evidence presented). The evidence also demonstrates that termination of Mother parental rights would best serve Child's needs and welfare. 23 Pa.C.S.A. § 2511(a)(8). Although Mother's progress is commendable, at all times Child's best interests and permanency takes precedence.

Our Supreme Court has instructed that this Court should defer to the trial court where a case is a "close call." **See In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). The Court has stated:

> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by

the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations omitted). As often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Samuel–Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). "Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.*

Upon thorough review, we conclude Judge Gingrich's finding that the Agency established grounds for termination of Mother's parental rights pursuant to section 2511(a)(8) is supported in the record. Likewise, we conclude that the record evidence supports the Judge Gingrich's decision that terminating Mother's parental rights would serve the developmental, physical, and emotional needs and welfare of Child pursuant to section 2511(b). As this Court has explained, "[s]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). "While a parent's emotional bond with his or her child is a major aspect of the [section] 2511(b) best[-]interest analysis, it is nonetheless only one of many factors to be considered by the [trial] court when determining what is in the best interest of the child."

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (*citing K.K.R.-S.*, 958 A.2d at 533-36).

> In addition to a bond examination, the trial court can **equally emphasize the safety needs of the child**, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (emphasis added, original brackets omitted); *see also In re J.N.M.*, 177 A.3d 937, 943-44 (Pa. Super. 2018) (stating that, in performing best-interest analysis pursuant to section 2511(b), trial court should consider parent-child bond, if any exists, safety needs of the child, intangibles, such as love, comfort, security, and stability child may have with current caregiver, and importance of continuing any relationship child may have with caregiver).

Here, the court clearly emphasized Child's safety and security in light of his challenging mental health issues. The record supports the court's finding that Child suffered exacerbation of symptoms, including violent and self-harming behaviors, both before and after visits with Mother, that Child is safe, calm, stable, happy, and flourishing in is foster home, and that his foster parents wish to adopt him. Judge Gingrich made clear his acknowledgement of Mother's love for Child and her exceptional work in changing her life, but found Mother was unable to address Child's severe mental health concerns and that his "mental condition appears to be more stable in his foster home,

than in the care of Mother." Trial Court Opinion, *supra* at 18. Additionally, the record overwhelmingly supports the court's determination that Child's bond with Mother "is not a safe, secure bond, but rather a trauma bond[,]" and that terminating that bond would best serve Child's developmental, physical, and emotional needs and welfare. *Id.* Herein, the trial court concluded that severing the parental bond and freeing Child for adoption was in Child's best interest because the parental bond that nurtures safety, security, and permanency exists between Child and his foster parents, and not with Mother. Our review of the certified record confirms the trial court's conclusion.

We find no abuse of discretion. *S.P.*, *supra*. Accordingly, we affirm the order pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2022